# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

**FILED**
JUN 0 6 2018
IN THIS OFFICE
Clerk U. S. District Court
Greensboro, N.C.
By_____

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
1111 Kenly Street, )
Salisbury, North Carolina, )
as depicted in Attachment A )

Case No. 1:18 mJ 161

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

1111 Kenly Street, Salisbury, North Carolina, as depicted in Attachment A and incorporated by reference herein

located in the _____Middle_____ District of _____North Carolina_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 7 U.S.C. § 2156 | animal fighting |

The application is based on these facts:

See Attachment C

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Steve Bailey, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/6/2018

_____
*Judge's signature*

City and state: Winston-Salem, North Carolina

Joi Elizabeth Peake, United States Magistrate Judge
*Printed name and title*

# ATTACHMENT A

## PREMISES TO BE SEARCHED

## 1111 KENLY ST. SALISBURY, NORTH CAROLINA 28144

### Subject Premises A



1111 Kenly Street, Salisbury, NC, is a one story single-family residence with beige siding. The front door faces East towards Kenly St. The numerals "1111" are affixed in white numbers to the right of the front door. The area to be searched includes the entire residence, curtilage, and any outbuildings, as well as any vehicles registered to Kelo McCain which are located on the property or curtilage.

The following items are to be seized for the time period from January 1, 2014 to the present.

Evidence, fruits, and instrumentalities of violations of 7 U.S.C. § 2156 and 18 U.S.C. § 371 in the form of the following:

1. All live or dead dogs, including puppies born or unborn;

2. Other animals capable of being used in the dog fighting training process;

3. All dog fighting paraphernalia, including: treadmills, jenny mills, exercise wheels, hides or other material used as hanging devices to strengthen or condition dogs; collars, leashes, chains, and other devices capable of being used to exercise or restrain fighting dogs; wooden sticks or handles capable of being used to pry open dogs' jaws; breeding stands; weight scales; and any washtubs, buckets, pails, and sponges capable of being used to wash dogs;

4. Any books, magazines, photographs, film, videotapes, or writings that contain material that depicts or promotes dog fighting or training;

5. Any awards, trophies, plaques, or ribbons promoting or relating to dog fighting;

6. Any film, video or audio recordings, memory cards, or other storage devices capable of recording dog fighting activity, specifically with respect to these devices, any such video and audio recordings which are related to dog fighting activity;

7. Animal carrying cases, pens, chains, or leads;

8. Antibiotics, drugs, or vitamins capable of being used to treat injured dogs or to enhance their performance; needles and syringes capable of being used for the administration of such drugs; suture or surgical staple kits and other veterinary supplies; commercial dog food;

9. Registration papers or other materials (written or otherwise) showing ownership or transfer of dogs, including bills of sale, pedigrees, breeding records, transport documents, shipping records, certificates, receipts, and veterinary records;

10. United States Currency;

11. Any documents and records of financial accounts or transactions related to payment for or proceeds from or related to dogs, including account statements, deposits, withdrawals, checks, debits, wire transfers, or other documents;

12. Any dog fighting records, including names and telephone numbers of persons suspected of being dog fighters; any rules, contracts, training logs, breeding records or other written agreements concerning the fighting of dogs;

13. Any constructed enclosures or components of any pits or enclosures capable of being used for the purpose of dog fighting, training dogs for fighting, or housing dogs intended to be used for fighting, including any carpeting or other materials used on the floor or walls of such enclosures;

14. Any dog or other animal carcasses located or buried on the property, or parts or skins thereof;

15. Any flooring or wall components displaying evidence of blood, fur, or other animal matter;

16. Any utensils or weapons capable of being utilized in the killing of animals, to include ropes, wire, guns, rifles, spent shotgun shells, spent bullet cartridges; buckets, barrels, or other devices capable of being used to drown dogs; baseball bats, metal pipes, batteries, electrical wires and clips, knives; and barrels, flammable substances, and other items capable of being used to burn live or dead dogs;

17. Devices capable of being used to deter barking in dogs, including collars, sprays, and sonic emitters;

18. Deposits of blood, fur, or other animal matter located on the property;

19. Material (e.g., from buccal (cheek) swabs) for DNA determination from all live dogs for purposes of comparison with other blood/tissue evidence;

20. Any and all materials reflecting the destruction of evidence at that location, including destroyed, damaged, or tampered with documents, flooring, wall components, or other structures;

21. Soil, blood, fur, animal skins and vegetation from the property to be used for forensic testing;

22. For any electronic storage media whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant:

    a. evidence of who used, owned, or controlled the electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence of the attachment to the electronic storage media of other storage devices or similar containers for electronic evidence;

    e. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage media;

    f. evidence of the times the electronic storage media was used;

g. passwords, encryption keys, and other access devices that may be necessary to access the electronic storage media;

h. documentation and manuals that may be necessary to access the electronic storage media or to conduct a forensic examination of the electronic storage media;

i. records of or information about Internet Protocol addresses used by the electronic storage media, as relates to dog fighting activity;

j. records of or information about the electronic storage media's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses, as relates to dog fighting activity;

k. contextual information necessary to understand the evidence described in this attachment.

23. In order to search for the items described above that may be maintained in electronic storage media, and which may constitute evidence regarding dog fighting activity or possession of animals for purposes of dog fighting activity, law enforcement personnel are authorized to search, copy, image and seize the following items for off-site review:

a. any electronic storage media capable of storing the items described above, which constitute evidence of dog-fighting activity or possession of animals for dog-fighting activity; and

b. any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the electronic storage media;

c. such authorization to search extends to the cellular telephone with telephone number (704) 431-8088; other cellular telephones or mobile devices may be copied, imaged,

## ATTACHMENT B – ITEMS TO BE SEIZED

and/or seized, but must be the subject of a separate search warrant to be searched

(with the exception of the cellular telephone with telephone number (704) 431-8088).

## ATTACHMENT C

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Steve Bailey, Special Agent with the United States Bureau of Alcohol, Tobacco, and Firearms (ATF) state under the penalty of perjury, pursuant to Title 28, United States Code, Section 1746, that the following is true and correct.

1.     I am a Special Agent with the ATF, where I have been employed since 2001. From 1994 until I joined ATF in 2001, I was a police officer in Phoenix, Arizona.

2.     I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7) in that I am an officer of the United States who is empowered by law to conduct investigations and to make arrests for federal felony offenses.

3.     Through my training and prior investigations of persons arrested for animal fighting offenses, I am familiar with the actions, traits, habits, and terminology used by handlers or owners of dogs involved in animal fighting ventures.

4.     I submit there is probable cause to believe that evidence of a crime, fruits of a crime, and instrumentalities of violations of 7 U.S.C. § 2156 (animal fighting) and 18 U.S.C. § 371 (conspiracy), are located at and inside the property known as 1111 Kenly Street, Salisbury, North Carolina, including the residence, yard, curtilage, vehicles and outbuildings on the property (hereinafter the "SUBJECT PREMISES"), which is an address associated with KELO MCCAIN. I also submit there are animals (specifically pit-bull type dogs) which there is probable cause to believe were involved in violations of 7 U.S.C. § 2156, and which are subject to seizure pursuant to 7 U.S.C. § 2156(f). I submit this application and affidavit in support of a search and seizure at the SUBJECT

PREMISES as described in Attachment A for the items described in Attachment B, to include live animals (dogs), and evidence, fruits, and instrumentalities of animal fighting venture crimes. Both Attachments are incorporated herein by reference.

5.     The statements contained in this affidavit are based in part on: information provided by federal agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents; information gathered from the service of grand jury subpoenas; the results of physical and electronic surveillance conducted by law enforcement agents; and my experience, training and background as a Special Agent with ATF. Because this affidavit is being submitted for the limited purpose of securing authorization for the requested seizure, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish the necessary foundation for the requested seizure.

## RELEVANT STATUTES

6.     This investigation concerns alleged violations of 7 U.S.C. § 2156 and 18 U.S.C. § 371 (dog fighting in violation of the federal Animal Welfare Act and conspiracy). The Animal Welfare Act defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(g)(1). It is illegal to sponsor or exhibit an animal in an animal fighting venture. 7 U.S.C. § 2156(a)(1). It is also illegal to possess, train, sell, buy, transport, deliver or receive an animal for purposes of having the animal participate in an animal fighting venture. 7 U.S.C.

2

§ 2156(b). All of these offenses are felonies punishable by up to five years in prison. 7 U.S.C. § 2156(j); 18 U.S.C. § 49.

7.      The Secretary of Agriculture is authorized to enforce the Animal Welfare Act, which provides that "[t]he Secretary or any other person authorized by him shall make such investigations as the Secretary deems necessary to determine whether any person has violated or is violating any provision of this section." 7 U.S.C. § 2156(f).

8.      The Animal Welfare Act states that "[a] warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located." *Id.* Any animal "involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States" in either a civil or criminal proceeding. *Id.*; 28 U.S.C. § 2461.

## BACKGROUND REGARDING ANIMAL FIGHTING VENTURES

9.      Based on my training and experience in investigation dog fighting ventures, I have learned the following:

10.     American Pit Bull Terriers, commonly called Pit Bulls, are the most prevalent type of dogs used in dog fighting ventures. Dog fighters typically wait until their dogs are around two years old to enter them into dog fights, but will begin training them prior to that age. Around two years old, Pit Bulls start to show more dog aggression. Fighting dogs may have apparent wounds and injuries that are typically most notable on

3

their faces, because the dogs are trained to fight face-to-face. The ears, jaws, and front legs may also have noticeable wounds. Scars are less visible on tan-colored Pit Bulls, but may be found by veterinary inspection. Scars are typically visible on black-colored Pit Bulls. Dog fighters often take pride in their individualized wound-treatment procedures and products of choice and act as make-shift veterinarians for their dogs by giving medication, tending to wounds, etc.

11.    It is common for dog fighters to possess dogfighting paraphernalia used to breed, exercise, train, restrain and strengthen or condition their dogs, including:

    a.    treadmills, including treadmills that are modified to keep a dog from getting off the treadmill;

    b.    "rope hangs"—ropes that dangle animal hides or "lures" that, when gripped by a dog's mouths, result in the dog being suspended entirely off the ground. Rope hangs are commonly used by dog fighters to strengthen and condition a dogs jaw and neck muscles to achieve a better "bite";

    c.    weighted collars, leashes, chains, and other devices used to exercise or restrain fighting dogs, and weight scales;

    d.    "break sticks"—sticks of wood, plastic, fiberglass, resin or other material that are used to pry open the jaws of dogs;

    e.    "flirt poles"—long poles with a hide or fur lure attached that is moved around by a trainer to tease a dog;

4

f. "jenny mills"—a jenny mill is a large, outdoor exercise apparatus that harnesses a dog to a spoke that projects from a center shaft; a lure (such as an animal hide or fur) is attached to a separate spoke and hangs beyond the dog's reach, causing the dog to run in circles as it attempts to get the bait;

g. washtubs, buckets, pails, and sponges used to wash dogs.

12. It is common for dog fighters to collect and maintain indefinitely in their residences: books, magazines, photographs, film, videotapes, and writings depicting or promoting dog fighting and the training/conditioning of dogs for fighting; awards, trophies, plaques, or ribbons.

13. Dog fighters who possess dogs for the purpose of dog fighting will implement a strict exercise and feeding regimen for a dog prior to a scheduled match, called a "keep," to ensure that the dog does not weigh more than the agreed-upon weight, and in hopes of conditioning the dog to out-fight its opponent. Dog fighters regularly share keeps with their dog fighting associates to help advance each other's dogs and kennels, and keeps are maintained indefinitely by dog fighters as resources.

14. It is common for dog fighters who fight dogs to possess medical supplies in order self-treat injured dogs or to enhance the performance of fighting dogs. Such items include, but are not limited to animal medications, antibiotics, vitamins, steroids, needles and syringes, suture kits, any wound care salve including "Cut-Heal" brand ointment, "Stop

5

Bleed," and other veterinary supplies, which items are often kept as long as an individual is involved in dog fighting, even if dogs are not kept at the dog fighter's residence.

15. It is common for dog fighters who fight dogs to have weapons, handguns, shotguns, or rifles in order to protect the premises upon which illegal dog fighting occurs, as well as utensils or weapons that can be used to kill animals, including include ropes (for hanging dogs), wire, guns, rifles, shovels, baseball bats, and metal pipes. Typically, when a dog does not perform well, its dog fighter owner will kill, or "cull" the dog. It is common for dog fighters who fight dogs to have Pit Bull breed dog carcasses or other animal carcasses or remains buried on their property.

16. The term "game" or gameness refers to a dog's courage and tenacity to fight. The term "schooling" refers to testing the gameness of a dog at a young age. The abbreviation #xw is used to denote the number of times a dog has won a match (with # representing the numerical digit). The abbreviation #xl is used to denote the number of time a dog has lost a match. A "show" can refer to a single match or a gathering during and at which multiple matches occur.

17. It is common for dog fighters who fight dogs to possess materials, in paper or electronic form, showing ownership of Pit Bull breed dogs including breeding records, stud fees, receipts, shipping slips, bills of sale, pedigree records, records pertaining to a dog's bloodline, registration records, vaccination records, notes, and ledgers, contracts, training logs ("keeps"), and other written records and agreements concerning the fighting of Pit Bull breed dogs, especially if the materials pertain to dogs that have attained a certain

6

status or title on account of winning fights, or dogs who are offspring of such winning dogs. These titles include:

- Champion ("Ch.")—a dog that has won three contracted matches
- Grand Champion ("Gr. Ch.")—a dog that has won five contract matches
- Register of Merit ("ROM")—title given for a dog that produces a certain number of dog fight winners amongst its offspring
- Gamest in Show ("GIS")—a dog's "game" is its willingness or desire to fight. This term is used to designate a dog that was particularly feisty or "game" during a match or a show (series of matches).
- Best in Show ("BIS")—assigned to the best winner of a dog fight (as compared to multiple matches during the "show")

18.     It is common for dog fighters who fight dogs to use constructed enclosures, pits, arenas, or "boxes" within which dogs are trained and/or fought. Such enclosures may be constructed of plywood or a comparable material to form the outside wall, and carpeting may be used for the floor of the enclosure. Materials used for such enclosures often display evidence of dog blood, fur, or other animal matter, which is not easily disposed of and often stays on the material forever.

19.     Evidence of dogfighting is likely to be found: inside a dog fighter's residence, in outbuildings such as barns, garages, or sheds; inside vehicles (which are used to transport dogs to and from fights); in outside areas of the property, including backyards,

7

curtilage, fields, and acreage;and stored in electronic devices, such as a computers and cellular telephones.

20.  It is common for dog fighters who fight dogs to use cameras, video cameras, camera phones, film, video or audio recordings, memory cards or other storage devices, and/or cellular telephones, to record dog fighting activity and communicate with other dog fighters. Dog fighters regularly use text messaging, e-mail communications, online social media applications, online chat rooms, blogs, online magazines, and other electronic devices and means to communicate about training and breeding dogs for fighting, to set up matches and make bets on dog fights, to advertise and promote the locations and dates/times of dog fight matches, and to discuss the results of matches and forfeits. Dog fighters are generally proud of their dogs and indefinitely maintain communications, images, and videos of their dogs, even after their dogs have died.

21.  Dog fighters often keep travel records related to fights and receipts and/or records of fighting activity, both in paper and electronic form. Dog fighters also maintain records, in paper and electronic form, of shipments of dogs to other dog fighters, particularly for breeding purposes (to prove a dog's pedigree/bloodline).

22.  Gambling is a central component of dog fighting ventures. Prior to a match, dog fighters whose dogs are competing against one another agree to each wager a certain amount of money. Typically, half of the wagered money is put into escrow in advance of the fight and held by a third party. This serves to guarantee that each party will show up to the fight or risk forfeiting the advanced money. In addition to the main event wager, side

8

betting is common among spectators, and is more informal or loose. Side-betting rules are often set on site and may change frequently.

23.     In an organized match there is a contract that establishes the rules and parameters of the fight, including the sex and weight of the opposing dogs. (Dogs that are set to fight one another must be of the same gender and same weight). "Off the chain" fights are "unofficial" and not contracted; they often occur between dogs that are not yet fully trained as fighting dogs. A "roll" or "bump" is a practice fight used to train a dog.

24.     A dog's "pedigree" is of utmost importance to a dog fighter. Dogs that are used for dog fighting are typically the product of cross-breeding between dogs that have champion pedigrees and bloodlines. Pedigrees will include notations respecting a dog's wins, losses, and earned titles, as well as such information for several generations of the dog's ancestors.

25.     The American Dog Breeder's Association, Inc. ("ADBA") is an organization in Salt Lake City, Utah, that maintains a registry of American Pit Bull Terriers and Pit Bull kennels. The organization claims to be "the largest registration office of the American Pit Bull Terrier." The ADBA states on its website that it "does not condone any illegal activity, but will never deny the history of our breed." The ADBA issues registration certificates for Pit Bull owners who provide proof of a dog's pedigree/bloodline, as well as registration certificates for Pit Bull kennels.

26.     The American Pit Bull Terrier Online Pedigrees ("APBT") is a "web based pedigree application" that allows users to add their dog's pedigrees to the website, along

9

with a picture of the dog, and provides a search tool to find pedigrees for thousands of dogs. The website displays "offspring listings, sibling listings and a nice tool that displays the genetic contribution of each dog's ancestor in the first 4 generations." (http://www.apbt.online-pedigrees.com, last visited on June 1, 2018). The APBT web platform also has private chat rooms in which members can communicate with each other through instant messaging chats. The APBT website does not include any contact information for individuals who administer the site. A search through the CLEAR law enforcement database indicates that APBT was incorporated in 2011 in El Paso, Texas. Dog fighters use APBT to post their dog's pedigrees, to research pedigrees for breeding and sales, and to communicate with other dog fighters about dogs and bloodlines.

27. There are three generally three categories of dog fighters:

    a. Organized (professional)—The organized dog fighters breed, train, and fight their own dogs, operate on a national level and are often featured in "underground" publications on a regular basis. The fights they participate in are often high-stakes matches featuring experienced fighting dogs with established blood lines.

    b. Hobbyist—The hobbyists are individuals who live within a reasonable distance of one another and are familiar with everyone involved. Hobbyists tend to put a greater emphasis on the gambling involved in dog fighting rather than the continuance of "game" (courage and tenacity of a fighting dog) bloodlines through selective breeding. They often

10

purchase dogs of average ability and, with little or no conditioning, enter them into a match. Some Hobbyists may see themselves as serious or on the verge of becoming serious fighters; their objective is to regain the purchase price of the dog through bets and winning.

c. Street fighters—The street fighters are individuals involved in street fighting who engage in impromptu matches that are often initiated in public parks, playgrounds, and back alleys as a means of increasing their image in a neighborhood. This group is usually comprised of amateur participants.

## INVESTIGATION AND PROBABLE CAUSE

28. Since at least March 2017, multiple law enforcement agencies in various counties of western Michigan have been investigating numerous subjects who are involved in promoting dog-fighting ventures and possessing dogs for the purpose of having those dogs participate in fights, in violation of 7 U.S.C. § 2156(a)(1) and (c). The law enforcement agencies involved in the investigation include, among others: Ingham County (Michigan) Animal Control and Ingham County Sheriff's Department, Michigan State Police ("MSP"), and Eaton County (Michigan) Animal Control. Due to the expansive nature of the dog-fighting ventures and overlapping subjects and criminal activity across counties, in November 2017, the Bureau of Alcohol, Tobacco, Explosives & Firearms ("ATF"), the United States Department of Agriculture—Office of Inspector General ("USDA-OIG") and the Federal Bureau of Investigation ("FBI") joined the investigation.

11

29.     The subjects of the investigation include, among others: Michigan-based subjects CHARLES MILLER, KIAN MILLER, DAMIANE BUEHRER, CHARLES DAVIS JR., and JARVIS ASKEW, and North Carolina-based subject KELO MCCAIN, each of whom are involved in the operation, support, or promotion of one or more dog "kennels" that exist solely for the purpose of breeding and training dogs for fighting, as explained in more detail below.

### A.     *Stick Wit Me Kennels* is a Dog Fighting Operation Owned and Operated By CHARLES MILLER and CHARLES DAVIS, JR.

30.     As set forth below, law enforcement has determined that, under the guise of an organization by the name of "*Stick Wit Me Kennels*," also known as "*SWMK*," CHARLES DAVIS, JR. (DAVIS), CHARLES MILLER (MILER), and others, work together to train fighting dogs, maintain and care for fighting dogs, purchase and breed fighting dogs, and attend and gamble on animal fighting ventures. The investigation has shown that KELO MCCAIN is an associate and advocate of *Stick Wit Me Kennels*.

31.     Pursuant to a Michigan state-issued search warrant, on July 27, 2017, law enforcement searched CHARLES MILLER's residence at 1415 Lansing Ave., in Lansing, Michigan. Law enforcement seized six pit bull-type dogs as well as dog fighting paraphernalia and evidence including:

- a spring pole

- a hanging scale

- a treadmill equipped with a wooden apparatus used for dogs

- a plastic dog crate bearing a United Airlines shipping label indicating that the crate was shipped from Ecuador to Michigan

- videos of dog fighting, and

- letters from prison inmates discussing dog fighting.

32.     During the search of MILLER's residence, law enforcement also seized a Samsung cellular telephone with the number (517) 993-7105, which was subsequently searched in accordance with a state and federal warrant ("MILLER's phone"). The data in MILLER's phone included call logs, contacts, text messages, photographs, videos, and social media content (including messages and group chats), for the approximate time period of December 8, 2016 to July 27, 2017.

33.     An examination of MILLER's phone revealed text messages between MILLER and telephone number (704) 431-8088. This number was listed in MILLER's contacts as belonging to KELO MCCAIN and, as indicated below, is associated with subject KELO MCCAIN based on his self-disclosure to law enforcement. On or about April 2, 2017, MILLER sent a text message to KELO MCCAIN asking if KELO MCCAIN had any dogs to sell. KELO MCCAIN replied that he (KELO MCCAIN) had "a few pups you'd love." KELO MCCAIN, via text message, sent a pedigree for the sire "Midnight," and indicated via text message that the puppies were about twelve weeks old. On or about April 22, 2017, MILLER, via text message to KELO MCCAIN agreed to purchase two dogs from KELO MCCAIN for $1,500 total. Between April 23, 2017 and May 25, 2017, MILLER made three payments to KELO MCCAIN for $500 each, via Western Union. On

13

or about June 13, 2017, KELO MCCAIN contacted MILLER via text and stated: "Found a transporter be here Thursday…be there Saturday."

34.     On or about June 20, 2017, Ingham County (Michigan) Animal Control responded to 134 W. Willow Street in Lansing, Michigan as part of an investigation into an animal welfare complaint. This investigation resulted in the seizure of two pit bull-type dogs from the registered owner of the residence. The owner stated the two dogs belonged to MILLER and that MILLER recently purchased the dogs from South Carolina. Following the seizure, MILLER went to Ingham County Animal Control and identified the dogs as "Night" and "Sammy" and claimed ownership for both.

35.     An examination of MILLER's phone revealed a video of the pit bull-type dog "Nightmare" at the 143 Willow Street property address. A comparison of photographs from photos of "Night" taken by Ingham County Animal Control to the video of "Nightmare" taken by MILLER confirms they are the same dog.

36.     A review of APBT online database of pedigrees reveals an online pedigree for "*SWMK* NIGHTMARE ON WILLOW BLK AKA MR NORTHSIDE." Further review of this pedigree shows "Nightmare" is the offspring of two dogs owned by *Corner 2 Corner Kennels*. This pedigree further shows dog fighting notations within the second, third, and fourth generations. The pedigree lists the breeder as "*C2C*" and the owner as "*SWMK.*"

14



**B.** *Corner to Corner Kennels* **Is A Dog Fighting Operation Owned And Operated By KELO MCCAIN.**

37. On January 26, 2017, the Salisbury Police Department started an investigation of KELO MCAIN ("KELO MCCAIN") regarding cruelty to animals. This investigation revealed that KELO MCCAIN had a total of forty-two pit bull-type dogs housed at 1111 Kenly Street, Salisbury, North Carolina. According to the report from the Salisbury Police Department of their visit to the residence with animal control officers, the dogs were secured on heavy chains keeping them separated from each other which is indicative of the way fighting dogs are kept. Furthermore, the report states that several of the dogs appeared to have wounds and dried blood on them. According to the report, most

15

of the dogs were in poor health, with at least one dog bleeding profusely while the officers were present.

38.    A review of KELO MCCAIN's publicly-available Facebook account revealed that he is associated with *Corner 2 Corner Kennels* out of Salisbury, North Carolina. A comparison of photographs from the North Carolina offender database and the KELO MCCAIN Facebook account clearly confirm the identification of KELO MCCAIN.



39.    Further review of the KELO MCCAIN Facebook account revealed photographs of KELO MCCAIN, in a photo album labeled "Mexico," in or around November 2014 at what appears to be a dog-fighting event. KELO MCCAIN is shown

16

posing with a pit bull-type dog, for which KELO MCCAIN links a pedigree. The online pedigree #194196 identifies the dog as Grand Champion *Corner 2 Corner's* CAPOEIRA. The four-generation pedigree shows that CAPOEIRA is bred from game dog lineage.

//

//

//

//

//

//

//

//

//

//

//

//

**GRCH CORNER 2 CORNER'S CAPOEIRA*****

BREEDER:  CHINO STEVE
OWNER:  KCASHFLOW
SEX:  FEMALE
COLOR:  CHOCOLATE RED
BIRTHDATE:  2009-07-02
ENTERED BY:  KCashflow
POSTED:  2010-02-27
LAST MODIFIED:  2017-10-22
PEDIGREE HAS BEEN SEEN:  24788 TIMES

*She made the BEST of em, look like the REST of em!!!*

## 4 GENERATION PEDIGREE

| First | Second | Third | Fourth |
|---|---|---|---|
| | | **CARDENAS KING** | **CH GONZALEZ' CUBO (4XW)** |
| | | | GONZALEZ TOSCA |
| | **CARDENAS' CRAZY** | | |
| | | **CARDENAS' CLEO** | **CH GONZALEZ' CUBO (4XW)** |
| | | | STONE BITER |
| (Sire) CHINO STEVE & WBR'S CRAZY JR | | | |
| | | **CARDENAS' CRAZY** | CARDENAS KING |
| | | | CARDENAS' CLEO |
| | **CARDENAS' SALSITA** | | |
| | | **CH CARDENAS' SALSA** | **CH CARDENAS' CHATO** |
| | | | CARDENA'S KATRINA II |
| | | **CH CARDENAS' CHATO** | **CH MORFIN'S AFOGUTU (CARDENAS' SHORTY) (4XW) ROM** |
| | | | MORFIN'S BUNGA |
| | **CARDENAS' RONCO** | | |
| | | **CARDENAS' MINNIE ME** | CARDENAS' STOMPER II |
| | | | CARDENAS' MILAGROS |
| (Dam) A. CARDENAS CHOCOLATA 1XW | | | |
| | | **MORFIN'S MARAT.** | FONTENOT'S BOOGER |
| | | | MORFIN'S SUIVA |
| | **CARDENAS CHAVELA** | | |
| | | **MORFIN'S BROSA** | MORFIN'S MARAT |
| | | | MORFIN'S IAN |

*Information stored in and displayed by: apbt.online-pedigrees.com*

40.     Further review of the KELO MCCAIN Facebook account revealed multiple postings of his "Grand Champion" pit bull-type dog, CAPOEIRA. A Facebook "friend" of KELO MCCAIN's commented in March 2018 that CAPOERIA had a litter of puppies six months prior to March 2018, and that she was "in heat" again. The "friend" also commented that CAPEOIRA was eight years old. Based on these comments, and others from KELO MCCAIN's publicly-available Facebook page, CAPOIRA is retired and is being used by KELO MCCAIN for breeding purposes.

### C.     Physical Evidence at 1105 Short Street, Salisbury, North Carolina

41.     During the investigation of similar animal cruelty cases, I have participated in the execution of search warrants relating to the residences of individuals associated with animal fighting ventures. During execution of these search warrants, I have recovered many of the aforementioned records from the homes of these individuals. More specifically, recent search warrants executed at the homes of similar individuals have yielded evidence in the form of: animals, both live and dead; animal fighting paraphernalia, such as steroids, wound care kits; training materials, such as treadmills and spring poles; dog fighting contracts; pedigree information; underground dog fighting publications; dog fighting pits; and/or concealed proceeds of animal fighting ventures in the form of U.S. Currency.

42.     Based on my training and experience, I know that individuals that engage in animal fighting ventures must maintain records to support the illegal operation of animal

19

fighting. These records often constitute evidence of the sale and distribution of fighting animals, as well as contracts and match agreements of animal fighting ventures. Pedigree bloodline information and sanctioned match results are maintained to give value to offspring of certain fighting lines as well as for breeding rights and dogs for stud purposes.

43.   The premises located at 1105 Short Street, Salisbury is associated with KELO MCCAIN. As discussed above, MCCAIN is the owner/operator of *Corner 2 Corner Kennels*.

44.   A Salisbury Police Department vehicle accident investigation report dated February 15, 2018 identified KELO MCCAIN's home address as 1105 Short St., Salisbury, North Carolina. This same report also identified KELO MCCAIN's telephone number as (704) 431-8088. A database search for KELO MCCAIN's driver's license revealed that KELO MCCAIN has a North Carolina valid driver's license bearing number 000009746316 with a registered address of 1105 Short St., Salisbury, North Carolina.

45.   On May 8, 2018, Salisbury Police Department conducted an aerial surveillance from an airplane, approximately 9000 feet above 1105 Short St., Salisbury, North Carolina. During this surveillance, officers observed and photographed thirteen dog kennel areas located behind the residence in the wooded area of 1105 Short St., Salisbury, North Carolina. These kennel areas consist of a dog house and an area of yard/ground dedicated to a dog. The kennel areas are separated from one another in a manner that dog fighters are known to arrange their kennels—so the dogs are unable to physically reach other when on their respective leashes. The surveillance photography showed that the

20

ground surrounding the kennel areas had been worn to the dirt in round patterns, void of grass. Based on my training and experience, a fighting dog is typically staked to a central axle and often wears a circle into the ground, around the circumference of the area it can reach.

46.     On May 8, 2018, Salisbury Police Department conducted a drive-by surveillance of 1105 Short St., Salisbury, North Carolina. Officers could clearly observe from the road that there were dogs and dog houses kept behind 1105 Short St., Salisbury, North Carolina, in a manner consistent with the aerial surveillance photograph.

47.     On or about June 6, 2018, federal law enforcement officers executed a search warrant pursuant to a warrant signed by United States Magistrate Judge Peake on June 5, 2018, for the property at 1105 Short Street, Salisbury, North Carolina. Officers located 19 pit-bull type dogs at the residence. These pit-bull type dogs were kept in a manner indicative of dog fighting activity. No one was present at the residence.

**D.      Physical and Electronic Evidence Believed to be Inside the Subject Premises**

48.     Police officers and Animal Control officers responded to the residence at 1111 Kenly Street, Salisbury, NC, on January 26, 2017, regarding a cruelty to animals investigation. They found 42 dogs, most of which were malnourished and had old injuries. Some were inside the house and some were chained up outside the house. All dogs found outside of the residence were restrained to the ground with short, heavy metal chains. Similarly, the dogs observed at the 1111 Kenly Street residence on June 6, 2018,

were restrained in the same manner, with same of similar length and thickness chains. During the cruelty to animals investigation on January 26, 2017, the officers made contact with KELO MCCAIN at the 1111 Kenly Street residence and he admitted ownership of the property and all 42 dogs found at the 1111 Kenly Street premises.

49. Following execution of the warrant at the 1105 Short Street address, officers proceeded to the SUBJECT PREMISES, which is an address also associated with KELO MCCAIN, and an address at which animal control officers had previously observed KELO MCCAIN with Pit-Bull type dogs kept in a manner consistent with dog-fighting activity. Officers conducted a knock and announce at the SUBJECT PREMISES at approximately 10:15 a.m. on June 6, 2018. No one responded to the knock. Upon further inspection from the outside of the residence, officers saw household furniture in the residence.

50. Officers conducted a plain view observation of the SUBJECT PREMISES. The officers noted that there were approximately ten pit-bull type dogs present in the yard of the SUBJECT PREMISES. All of the dogs but one were kept on heavy chains. One dog was in a fenced-in kennel. All of the dogs were kept separate from each other.

51. At least one dog was bleeding from his face. Officers observed a few other dogs had old scarring on the front legs and face.

52. All of the aforementioned dogs were being kept in a manner or in conditions that were consistent with dog-fighting activity.

22

53.     Near the dog in a fenced in kennel, officers observed a spring pole made of rope. A spring pole is a hanging spring device that is designed so that once a dog bites it, the spring pole suspends the weight of the dog thereby strengthening its bite.

54.     Federal officers spoke with TALITA MCCAIN who asserts that she is the sister of KELO MCCAIN, and she confirmed that KELO MCCAIN is the owner of SUBJECT PREMISES and of the approximately ten dogs found at the SUBJECT PREMISES.   TALITA MCCAIN also indicated that KELO MCCAIN took care of the dogs at the SUBJECT PREMISES.

55.     One of the officers interviewed a neighbor of the 1111 Kenly Street address. The neighbor indicated that a person who frequently visited the 1111 Kenly Street address had been at the residence that morning and had arrived on bicycle. The neighbor identified the person who came to tend to the dogs on a regular basis as approximately 6'1" in height, athletic build, medium-skinned and with dreadlocks. This description roughly matches the physical description of KELO MCCAIN.

56.     One form in which the records might be found at the SUBJECT PREMISES is stored on a computer's hard drive or other storage media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

23

57. I submit that if a computer or storage medium is found on the premises, there is probable cause to believe those records will be stored in that computer or storage medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, computer storage media-in particular, computers' internal hard drives-contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system

configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.   Based on my training and experience, I am aware that computer equipment is almost always used to generate, store, and print documents, spreadsheets and programs relating to the promoting and carrying on of an animal fighting venture.

58.   As further described in Attachment B to the Seizure Application for the SUBJECT PREMISES, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

59.     Although some of the records identified herein might be found in the form of user-generated documents (such as word processor, picture, and movie files), computer storage media can contain other forms of electronic evidence as well:

  a.  Forensic evidence of how computers were used, the purpose of their use, who used them, and when, is specifically described in Attachment B to the Seizure Application for all target locations. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat, " instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance with particularity a description of the records to be sought, evidence of this type often is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application

27

of knowledge about how a computer behaves. Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the Seizure Application.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge, that can allow the computer to be used by others, sometimes without the knowledge of the computer owner. Also, the presence or absence of counter-forensic programs (and associated data) that are designed to eliminate data may be relevant to establishing the user's intent. To investigate the crimes described in this Seizure Application, it might be necessary to investigate whether any such malicious software is present, and, if so, whether the presence of that malicious software might explain the presence of other things found on the storage medium. I mention the possible existence of malicious software as a theoretical possibility, only; I will not know, until a forensic analysis is conducted, whether malicious software is present in this case.

f.   Searching storage media for the evidence described in the attachments
     may require a range of data analysis techniques. It is possible that the
     storage media located on the premises will contain files and
     information that are not called for by the Seizure Application. In rare
     cases, when circumstances permit, it is possible to conduct carefully
     targeted searches that can locate evidence without requiring a time-
     consuming manual search through unrelated materials that may be
     commingled with criminal evidence. For example, it is possible, though
     rare, for a storage medium to be organized in a way where the location
     of all things called for by the Seizure Application are immediately
     apparent.  In most cases, however, such techniques may not yield the
     evidence described in the Seizure Application. For example,
     information regarding user attribution or Internet use is located in
     various operating system log files that are not easily located or
     reviewed. As explained above, because the Seizure Application calls
     for records of how a computer has been used, what it has been used for,
     and who has used it, it is exceedingly likely that it will be necessary to
     thoroughly search storage media to obtain evidence, including evidence
     that is not neatly organized into files or documents. Just as a search of a
     premises for physical objects requires searching the entire premises for
     those objects that are described by a Seizure Application, a search of

29

this premises for the things described in this Seizure Application will likely require a search among the data stored in storage media for the things (including electronic data) called for by this Seizure Application. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

60.     Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

a.     The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

30

b.  The volume of evidence. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

c.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d.  Variety of forms of electronic media. Records sought under this seizure application could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

31

61.     In light of these concerns, I hereby request the Court's permission to seize the computer hardware, storage media, and associated peripherals that are believed to contain some or all of the evidence described in the Seizure Application, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the hardware, media, or peripherals on-site for this evidence.

62.     Authority is requested to seize any computer hardware or computer-related equipment capable of creating and/or storing information in electronic or magnetic form. Computer-related equipment includes, but is not limited to, central processing units and/or peripheral equipment used to facilitate the creation, transmission, encoding or storage of information. Agents seek the authority to search for any or all information and/or data stored in the form of magnetic or electronic encoding on computer media, or on media capable of being read by a computer, or with the aid of computer-related equipment. This media includes, but is not limited to, cell phones, floppy disks, fixed hard disks, external hard drives and enclosures, network attached storage units, removable hard disk cartridges, tapes, laser disks, videocassettes, CDs, DVDs, zip disks, smart cards, memory sticks, memory calculators, PDAs, USB flash drives, printers and fax machines with memory storage, electronic book readers, and/or other media that is capable of storing magnetic coding.

63.     Authority is sought to utilize the services of outside computer experts, who may not be federal law enforcement officers, in order to use and operate the computer

32

system(s) at the above specified location for purposes of retrieving the above specified computer information during the course of the authorized seizure, provided that such experts operate under the direction, supervision, and control of the Special Agents in charge of this case.

## CONCLUSION

64.     Based on the foregoing, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 7, United States Code, Section 2156, including animals which there is probable cause to believe were involved in any violation of Title 7, United States Code, Section 2156, will be found at the SUBJECT PREMISES, as further described in Attachment A.

This the 6 day of June, 2018.

Steve Bailey
Special Agent
Bureau of Alcohol, Tobacco, and Firearms


SWORN TO and SUBSCRIBED before me
this the ___6___ day of June, 2018.

Joi Elizabeth Peake
United States Magistrate Judge
Middle District of North Carolina

33